# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 25, 2011

## STATE OF TENNESSEE v. SAMIR RAMON MEJIA

**Direct Appeal from the Circuit Court for Sevier County**
**No. 14050-II      Richard R. Vance, Judge**

---

**No. E2010-00745-CCA-R3-CD - Filed July 27, 2011**

---

After a bench trial, the Sevier County Circuit Court convicted the appellant, Samir Ramon Mejia, of simple possession of a Schedule II controlled substance, a Class A misdemeanor, and sentenced him to eleven months, twenty-nine days to be served as six months in jail and the remainder on supervised probation. On appeal, the appellant contends that the trial court erred by denying his motion to suppress evidence because the arresting officer lacked reasonable suspicion to pat-down the appellant for weapons. Based upon the record and the parties' briefs, we conclude that the officer lacked reasonable suspicion for the pat-down and reverse the appellant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Richard L. Burnette (on appeal) and Bryan E. Delius (at trial), Sevierville, Tennessee, for the appellant, Samir Ramon Mejia.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; James B. Dunn, District Attorney General; and Ashley Musselman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that the Sevier County Grand Jury indicted the appellant for possession of .5 grams or more of a Schedule II controlled substance with intent to deliver, a Class B felony. At the bench trial, Sergeant Jeff Justus of the Gatlinburg Police

Department testified that on July 13, 2008, he was dispatched to a disturbance outside the Phillips 66 Bar on Highway 321. When he arrived, he saw a large group of people gathered outside. Sergeant Justus said that he had had contact with the appellant "[n]umerous" times before and that he saw the appellant and another man standing in front of the car the appellant usually drove, a white Dodge Magnum. The women who had called the police and were part of the disturbance were standing at the back of the car with a police officer. Sergeant Justus said that the appellant was having an argument with one of the women about car keys and that the appellant was "agitated." Sergeant Justus explained, "There was a large group of people behind us. For my safety and his, just so I didn't have to watch him and those people, I advised him I was going to pat him down for weapons." Sergeant Justus said he patted down the appellant and felt "something" in the appellant's left front pants pocket. He said, "From my experiences arresting people it felt like a pill bottle that's been used lately, in the last year or two it's been popular to put pills or narcotics in." Sergeant Justice said that he asked the appellant if the bottle contained cocaine and that the appellant "looked at me and nodded yes and lowered his head." Sergeant Justus pulled the item, which turned out to be a ceramic waterproof pill bottle attached to a key chain, out of the appellant's pocket, opened it, and found three small baggies containing white powder. The contents of the baggies weighed 1.6 grams. Sergeant Justus also found six hundred forty-four dollars on the appellant's person.

On cross-examination, Sergeant Justus acknowledged that people often used rolled up currency to ingest cocaine and that he did not test the appellant's money for the presence of cocaine. He also acknowledged that he knew the appellant by name and that the appellant always had been cooperative and compliant previously. He said that he had checked the appellant for weapons in prior incidents and that he had never known the appellant to possess a weapon. He acknowledged that he was not the first officer on the scene and said that he could not remember if he talked with the other officers present before he patted down the appellant. He said that when he first approached the appellant, the appellant was facing the front of the car. Sergeant Justice said that he turned the appellant around "to where I could pat him down and still see the crowd" and that the appellant was facing away from him at some point during the pat-down. He said he did not remember if the car keys already had been returned to the car's owner but acknowledged that he did not find any keys on the appellant when he conducted the pat-down. He acknowledged that he never asked the appellant for consent to reach into the appellant's pocket, that he never asked for consent to open the ceramic pill bottle, and that he never Mirandized the appellant. Sergeant Justus never asked the appellant where he got the cocaine or if it was for personal use.

On redirect examination, Sergeant Justus testified that about one year before this incident, he and other officers were at the same bar for a "bar check." Sergeant Justus saw the appellant walk out of the bar, go to the passenger side of a vehicle, and try to get

something out of the vehicle's center console. When the appellant realized Sergeant Justus was present, the appellant walked around to the driver's side and sat in the driver's seat. Sergeant Justus walked up to the vehicle and asked the appellant for a driver's license. The appellant did not have a license, so Sergeant Justus asked if he could search the vehicle. The appellant said yes, and Sergeant Justus found cocaine in the console. The appellant was charged with simple possession, but Sergeant Justus did not know the disposition of that case.

Clayton Hall, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI), testified that he tested the white powder in one of the baggies and that the powder was cocaine. The powder weighed .5 grams. He said he did not test the powder in the other two baggies due to "our back log production policy." He also said that because the amount of cocaine in the first baggie "falls into a category of penalty," he did not need to conduct further testing. On cross-examination, Hall testified that the scales in the TBI laboratory were calibrated monthly. He acknowledged that the scales had been calibrated about three weeks before he weighed the cocaine in this case.

Priscilla Gamble testified for the appellant that her sister, Amanda Gamble, was the appellant's girlfriend. On the night of July 13, 2008, Amanda[1] intercepted text messages from the appellant to another woman and wanted to speak with the appellant. Priscilla, Amanda, and their sister, Sandra, went to the bar. Priscilla and Sandra went inside, and Sandra asked the appellant for the keys to Amanda's car. The appellant said no. When Priscilla went outside, Sandra was on the telephone with the police. The police arrived and asked the appellant, who had come outside, who owned the car. The appellant told them Amanda owned it, and an officer gave the keys to her. Priscilla said the officers told the appellant that "you're free to go. You can go back inside if you want." She said that when Sergeant Justus arrived, the appellant "was walking back into the little area" and that Sergeant Justus asked, "[I]s that Samir?" Another officer said yes, and Sergeant Justus told the appellant to raise his arms. Sergeant Justus began patting down the appellant, reached into the appellant's pocket, and pulled out a pill bottle attached to a key chain. Priscilla said Sergeant Justus asked the appellant, "[W]hat is this?" She said the appellant would not respond and "just kept looking" at the officer. She said Sergeant Justus opened the bottle, put it into the appellant's hand, and said, "[I]s this cocaine, Samir?" The appellant did not say anything but just looked toward the ground. Sergeant Justus arrested the appellant.

Amanda Gamble, the appellant's girlfriend, testified that she and the appellant had two children together. On July 13, 2008, she was upset with the appellant because she had

---

[1]Because the witness and her sisters share a surname, we will refer to them by their first names for clarity.

found out he was talking to other females. She and her two sisters drove to the bar and pulled in behind her white Dodge Magnum. Amanda waited in the car while her sisters went into the bar. One of her sisters came outside and telephoned the police. Two officers arrived and asked the appellant who owned the car. The appellant told them Amanda owned it and gave the keys to an officer. The officer gave the keys to Amanda and told the appellant he was free to go. She said that as the appellant was going back into the bar, Sergeant Justus arrived and asked, "[I]s that Samir?" She said Sergeant Justus walked behind the appellant, patted him down, squeezed the appellant's pocket, pulled out a key chain, and asked the appellant, "[W]hat is this[?]" She said Sergeant Justus also asked the appellant, "[I]s this cocaine?" The appellant did not say anything and looked at the ground.

On cross-examination, Amanda testified that she had seen the appellant's paychecks previously, that they were "[u]sually fairly large," and that they were between five hundred and one thousand dollars. The appellant used the money to pay bills. She said she would not have been surprised that the appellant had a large amount of money with him on June 13 because he was paid the previous day. Finding that the State failed to prove the appellant possessed the cocaine for anything other than personal use, the trial court convicted him of simple possession, a Class A misdemeanor.

## II. Analysis

The appellant contends that the trial court erred by denying his motion to suppress the cocaine obtained as a result of the pat-down, arguing that Sergeant Justus did not have reasonable suspicion to conduct the search. He also argues that even if this court finds that the officer had reasonable suspicion, the evidence still should have been suppressed because the pill bottle did not fall under the plain feel doctrine and because the appellant did not consent to the officer's seizing the bottle. The State argues that the trial court properly denied the motion to suppress. We conclude that the officer lacked reasonable suspicion for the pat-down, and, therefore, that the trial court erred by denying the motion to suppress.

Before trial, the appellant filed a motion to suppress the evidence obtained as a result of Sergeant Justus' pat-down because the officer did not have reasonable suspicion to believe the appellant had committed a crime or was armed with a weapon. At the suppression hearing, Sergeant Justus testified that on July 13, 2008, he was dispatched to the Phillips 66 Bar due to a dispute over car keys. When he arrived, two officers were already present. The appellant was standing at the front of the car with another man, and the two officers were standing at the back of the car with two women. Twenty or more people had come outside of the bar to watch the incident.

-4-

Sergeant Justus testified that the appellant "was the only one in the group that was involved that did not have an officer with him, and out of safety and everything, I just approached him." Sergeant Justus knew the appellant's girlfriend owned the car. He walked up to the appellant and asked if the appellant had the keys. The appellant said yes. Sergeant Justus said the appellant was "tensed up and agitated." He said he told the appellant that "if it's okay I'm going to pat you down for weapons, just don't make any sudden movements." The appellant raised his arms, and Sergeant Justus began patting him down. The trial court stated, "We're dancing around here. I want to know what all was said and when and where." Officer Justus then stated as follows:

> Okay. As I approached I noticed two females, one of which I recognized as his girlfriend/fiancé, and another female at the back of the vehicle, mad, upset, and yelling at Mr. Mejia. I knew that that was her vehicle that she let him drive because we had stopped him several times before. Mr. Mejia was agitated and upset, and from previous dealings with him, the fact that he was on probation from an arrest I had had approximately a year before this call on a cocaine charge, and he was on probation, and the fact that I caught him the first time exchanging cocaine with another individual on that call. He was aggressive. There was a crowd of onlookers. So I knew that him being on probation and having the chance to go back, I patted him down. This bar also -- we've had numerous fights involving knives and weapons at this bar.

Sergeant Justus testified that the crowd made him feel "[n]ot real comfortable, too many people that were that close" and that the appellant's agitated state made him "[c]autious." He said he conducted a pat-down of the appellant and felt keys in the appellant's pocket. He said he also felt "a container, a pill bottle, that they sell at the gas stations. Every time I've taken those off of individuals after an arrest or whatever, they've always either had narcotics or the remnants of such in there." He said he asked the appellant, "Is that cocaine, Samir[?]" He stated that the appellant nodded his head yes and that the appellant put his head down "kind of dejectedly." Sergeant Justus reached into the appellant's pocket, pulled out the container, opened it, and found three small bags that appeared to contain cocaine. He said he knew the appellant was on probation because he had arrested the appellant about one year earlier and because the appellant had gone to trial on that charge. Sergeant Justus closed the bottle and arrested the appellant.

On cross-examination, Sergeant Justus testified that when he arrived at the scene, two officers were present; a third officer was either also present or arrived after Sergeant Justus.

He acknowledged that in his prior dealings with the appellant, the appellant always had been cooperative and had followed commands. The appellant had never been aggressive or belligerent. Sergeant Justus acknowledged that he recognized the appellant because he had arrested the appellant one time before. He said the appellant also had been stopped numerous times for traffic offenses and driving without a license. He said that he had never known the appellant to possess a weapon and that he "routinely" asked suspects for permission to conduct pat-downs. When asked if he asked the appellant for permission to conduct the pat-down in this case, he said, "I can't testify either way but I routinely ask people even if I have probable cause just to see their reaction." He acknowledged that the appellant was not free to leave prior to the pat-down and that he did not see any bulges in the appellant's clothing to indicate the appellant possessed a weapon.

The trial court ruled that the officer had reasonable suspicion to conduct the pat-down because a domestic dispute was in progress, a "volatile" situation was involved, and a crowd of "agitated" people had gathered. The court stated that "officers need to separate and sort things out." The court also determined that the officer had not seized the container pursuant to the plain feel doctrine but based upon the appellant's nonverbal response to the officer's question, "Is that cocaine, Samir[?]" The trial court denied the appellant's motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures by law enforcement officers. These constitutional provisions "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001) (quoting State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997)); see also State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997). In relation to the Fourth Amendment, our courts have recognized three distinct types of interactions between law enforcement and the citizenry, namely "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable

suspicion; and (3) brief police-citizen encounters which require no objective justification." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). A brief investigatory detention supported by reasonable suspicion is at issue in this case.

In Terry v. Ohio, 392 U.S. 1, 20-21(1968), the United States Supreme Court ruled that an investigatory stop is permissible under the United States Constitution if it is based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed. See State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002). Terry also approved an officer's limited and temporary seizure of a person for questioning and for a "pat-down" for weapons if an officer has a reasonable suspicion that the person is armed and dangerous. Id. at 26-28. In evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). These circumstances include, but are not limited to, "[the officer's] objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Watkins, 827 S.W.2d at 294 (citation omitted).

The State argues that Sergeant Justus "had reasonable suspicion to conduct a routine pat-down to ensure that the defendant, as one of the parties involved in the domestic dispute, was not armed." However, "Terry did not approve a 'pat-down' for weapons as standard procedure." State v. Kevon Fly, No. E2006-01979-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 599, at *26 (Knoxville, July 26, 2007); State v. Eric Berrios, No. W2005-01179-CCA-R9-CD, 2006 Tenn. Crim. App. LEXIS 193, at *28 (Jackson, Mar. 3, 2006); State v. Fred Arthur Stier, No. W1999-600-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 307, at *22 (Jackson, Apr. 7, 2000). The State also argues that this case is similar to an officer's conducting a traffic stop and frisking the driver to ensure the officer's safety. According to the State, "Like with a traffic stop, an officer responding to a domestic call at a bar, especially when that bar is a location where previous fights involving weapons have occurred, officer safety is a paramount concern." However, even in a case involving a traffic stop, an officer still must have reasonable suspicion that the driver is armed in order for a pat-down to be constitutionally permissible. State v. Berrios, 235 S.W.3d 99, 108 (Tenn. 2007).

Turning to the facts in this case, Sergeant Justus had to have a reasonable suspicion that the appellant was armed and dangerous in order to justify the pat-down. Sergeant Justus testified that he had had numerous prior interactions with the appellant, that the appellant always had been cooperative, that he had searched the appellant previously, and that he had never known the appellant to have a weapon. He saw nothing to indicate that the appellant was armed on the night of July 13, 2008. Sergeant Justus described the appellant as

-7-

"agitated"; however, a person in the appellant's situation understandably would be upset. Sergeant Justus also described the appellant as "aggressive" but provided no testimony at the hearing or at trial to support that characterization. We note that according to Sergeant Justus' description of the scene, one of Amanda Gamble's sisters, who was "mad, upset, and yelling" at the appellant, was acting in a manner more aggressive than the appellant.

Although Sergeant Justus claimed he was concerned about safety in the parking lot, his concern was due mostly to the crowd that had gathered to watch the incident, not the appellant's behavior. Moreover, although the trial court described the crowd as "agitated," nothing in the record indicates that the crowd was doing anything other than watching the disturbance. Sergeant Justus' testimony at the suppression hearing demonstrates that he relied heavily on his knowledge of the appellant's prior drug possession as justification for the pat-down. However, that knowledge alone does not justify a pat-down for weapons under Terry. Therefore, under the totality of the circumstances, we conclude that Sergeant Justus did not have reasonable suspicion to justify the appellant's pat-down. The trial court should have granted the appellant's motion to suppress.

### III.  Conclusion

Based upon the record and the parties' briefs, we conclude that the trial court erred by denying the appellant's motion to suppress. Therefore, the appellant's conviction for misdemeanor possession is reversed, and the charge against him is dismissed because the only evidence supporting the charge was obtained in violation of the Fourth Amendment.

_____
NORMA McGEE OGLE, JUDGE

-8-